**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| In the Matter of: | } | |
| | } | |
| YASMIN HAGEDORN, | } | CASE NO. 25-81483-CRJ-7 |
| | } | |
| | } | |
| | } | |
| | } | CHAPTER 7 |
| Debtor(s). | } | |
| MELINDA TSANG, | } | AP NO. 25-80173-CRJ-7 |
| | } | |
| | } | |
| Plaintiff(s), | } | |
| v. | } | |
| | } | |
| | } | |
| YASMIN HAGEDORN, | } | |
| | } | |
| Defendant(s). | } | |

## MEMORANDUM OPINION

This Adversary Proceeding came before the Court for trial on August 12, 2026 on the Amended Complaint to Determine Dischargeability of Debt, ECF No. 41, filed by Melinda Tsang (hereinafter the "Plaintiff"), and the Answer to Amended Complaint, ECF No. 46, filed by Yasmin Hagedorn (hereinafter the "Defendant"). The Plaintiff seeks a determination that the debt owed by the Defendant to the Plaintiff in the amount of $62,203.00 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) as a debt that was obtained by false pretenses, a false representation, or actual fraud.

This proceeding involves an emotionally tragic, ill-fated set of facts involving a scheme of deception and an international con man, the destruction of friendship, and the loss of substantial sums of money by the Plaintiff and others. The Plaintiff generally alleges that she transferred

$96,000.00 into the Defendant's checking account; that the Defendant promised to safeguard the funds in a separate account that she would personally open for the Plaintiff; and that after the Plaintiff expressed concerns regarding the safety of the funds, the Defendant repeatedly assured the Plaintiff that the funds were safe and would be returned to an account designated by the Plaintiff. The Plaintiff argues that the Defendant's repeated statements of assurance that the funds were safe and were in the process of being returned, constitutes "circumstantial proof of the [Defendant's] intentional misconduct."[1] The dischargeability issue under § 523(a)(2)(A) requires proof that the Defendant knew the representations at issue were false and that she made the false representations with intent to deceive the Plaintiff.

The Defendant admits that the loss occurred, but argues that she, herself, was taken advantage of by an international con man who took not only the money voluntarily deposited by the Plaintiff into the Defendant's checking account, but also thousands of dollars from the Defendant's savings account, as well as funds belonging to the Defendant's sister.

At the conclusion of the trial, the Court directed the parties to submit post-trial briefs addressing how the testimony and the evidence adduced at trial relates to the Plaintiff's cause of action under 11 U.S.C. § 523(a)(2)(A). On September 17, 2026, the parties filed their respective briefs.[2] The Court has carefully considered the post-trial briefs, the testimony and evidence presented at trial, and the applicable law, and finds that the Plaintiff failed to prove by a preponderance of the evidence that the Defendant made false representations with intent to deceive

---

1 *Id.* at p. 4.

2 *See* Plaintiff's Post-Trial Brief, ECF No. 49, and Defendant's Post-Trial Brief in Support of Dischargeability, ECF No. 48.

the Plaintiff, nor that the Defendant made a misrepresentation with reckless indifference to the truth for purposes of § 523(a)(2)(A).

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3]

## BACKGROUND AND PROCEDURAL HISTORY

On November 3, 2025, the Plaintiff, initially filed this proceeding without the assistance of legal counsel styled as a Complaint to Determine Non-Dischargeability of a Debt under 11 U.S.C. § 523(a)(4), wherein the Plaintiff alleged that the Defendant engaged in a scheme of deceit over a period of six months which ended with the Plaintiff transferring her life savings into the Defendant's checking account. The Plaintiff alleged that she entrusted the funds to the Defendant in a fiduciary-like relationship for purposes of § 523(a)(4) and that the Defendant immediately began withdrawing the funds for her own personal use.[4] On December 1, 2025, the Defendant filed an Answer, generally denying any wrongdoing.[5]

Following a Status Conference held on January 7, 2026, the Court entered an Order, requiring the Plaintiff to file a sworn Affidavit clearly setting forth the allegations asserted in her Complaint, along with supporting documentation, and requiring the Defendant to file a Brief in support of any defenses asserted.[6] On February 27, 2026, the Defendant filed a Brief in Support

[3] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Further, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.
[4] *See* Complaint, ECF No. 1, p. 3.
[5] Answer, ECF No. 5.
[6] *See* Order Requiring Affidavits and Briefs and Continuing Status Conference, ECF No. 8.

of Dischargeability, and Affidavit of Yasmin Hagedorn, in which the Defendant generally argued that she was not acting in a fiduciary capacity for purposes of § 523(a)(4) when the Plaintiff transferred the funds at issue into the Defendant's checking account.[7] On February 12, 2026, the Plaintiff also filed an Affidavit in Support of Complaint for Nondischargeability, along with supporting documentation.[8]

On March 4, 2026, the Court held a Status Conference in this proceeding and Jason Britt, Esq., first appeared as counsel on behalf of the Plaintiff. Because the Plaintiff had just obtained counsel, the Court continued the Status Conference and directed counsel for the Plaintiff to file a Brief addressing the issue of whether the Defendant was acting in a fiduciary capacity for purposes of § 523(a)(4) based on the allegations asserted. Prior to the deadline for filing the brief, counsel for the Plaintiff filed a Motion for Leave to Amend Complaint, requesting leave to drop the allegations regarding fiduciary responsibility and to amend the Plaintiff's Complaint to proceed instead under 11 U.S.C. § 523(a)(2)(A) based on allegations of intentional fraud and deceit.[9]

Following a hearing held on April 22, 2026, the Court entered an Order Approving Motion for Leave to Amend Complaint, Requiring Briefs, and Continuing Status Conference, requiring the parties to file Briefs addressing the applicable law under § 523(a)(2)(A) based on the allegations asserted which the parties timely filed.[10]

---

7 *See* Brief in Support of Dischargeability, ECF No. 12, and Affidavit of Yasmin Hagedorn, ECF No. 13.
8 *See,* Affidavit in Support of Complaint for Nondischargeability, ECF No. 14.
9 *See* Motion for Leave to Amend Complaint, ECF No. 29.
10 *See* Order Approving Motion for Leave to Amend Complaint, Requiring Briefs, and Continuing Status Conference, ECF No. 34.

Following a Status Conference held on June 17, 2026, the Court entered an Order Fixing Deadline and Scheduling Pretrial Conference, finding that this Adversary Proceeding should be scheduled for trial on the limited issue of intent being inserted by the Plaintiff under § 523(a)(2)(A), fixing the deadline for the parties to file a Pretrial Order, identifying all stipulated facts and exhibits and any undisputed conclusions of law.[11]

**FINDING OF FACTS**

The facts in this proceeding are largely undisputed as revealed by stipulated facts listed in the Pretrial Order dated July 24, 2026, in which the parties stipulated as follows: (i) In June of 2023, the Defendant travelled to India and then to Thailand, eventually settling in Cambodia; (ii) while in Bangkok, Thailand, the Defendant met Joshua Yarwood, also known as Joshua Martyn (hereinafter "Yarwood"); (iii) Yarwood represented to the Defendant that he worked for the United Nations (hereinafter the "U.N."); (iv) Yarwood befriended the Defendant and offered the Defendant a position with the U.N.; (v) the Defendant advised her friends and family that she was employed by and was working for the U.N.; (vi) the Defendant and Yarwood stayed in a rented home in Cambodia; and (vii) the Defendant introduced Yarwood to the Plaintiff.[12]

The parties further stipulated that in late October of 2023, the Defendant requested a loan from the Plaintiff for the stated purpose of obtaining Cambodian citizenship.[13] Thereafter, the Defendant informed the Plaintiff that a possible nuclear attack on Huntsville, Alabama was likely and encouraged her to leave and travel to Cambodia.[14] The Plaintiff initially agreed to travel to

---

11 *See,* Order Fixing Deadline and Scheduling Pretrial Conference, ECF No. 39.
12 *See* ECF No. 42, Pretrial Order, Stipulated Facts.
13 Id.
14 Id.

Cambodia and subsequently deposited funds from her account into the Defendant's Redstone Federal Credit Union account (hereinafter the "Redstone account").[15] The Plaintiff ultimately transferred a total of approximately $96,000.00 into the Defendant's Redstone account.[16] The Defendant advised the Plaintiff that a U.N. plane would pick her up and transport her to Cambodia.[17] After a series of events and the Defendant's return from Cambodia, the Defendant returned funds in the amount of $33,797.00 to the Plaintiff.[18]

The Defendant does not deny that she told the Plaintiff that she was employed by the U.N. and that she offered to arrange transportation for the Plaintiff and her daughter on a U.N. plane. Nor does the Defendant deny that she encouraged the Plaintiff transfer funds into the Defendant's Redstone account which were to be immediately transferred into a separate savings account that the Defendant offered to open for the Plaintiff's own use while in Cambodia.[19]

With hindsight, the undisputed facts in this case are all clearly incredulous as will be seen in more depth below, but the Plaintiff trusted the Defendant, and the Defendant unfortunately trusted Yarwood. The Plaintiff testified that she and the Defendant were very close friends, as close as sisters. The parties met in 2008, attended church together, and even lived together in the Plaintiff's home for five and a half years. Then in the summer of 2023, the Defendant decided to quit her job and move to India, with plans to work for or travel with a church ministry.

---

15 Id.
16 Id.
17 Id.
18 *Id.*
19 *See* Plaintiff's Exhibit 1, lines 669-671.

The Defendant testified she had always loved India and had hoped to live there permanently but was unable to do so because she had trouble with her visa. She then traveled to Bangkok, Thailand which is where she had the misfortune of meeting Yarwood. Shortly after arriving in Bangkok, the Defendant lost her cellphone. While in her hotel lobby using a computer to order a new phone, she met Yarwood. He was a younger man, wearing a U.N. badge on his belt. They struck up a conversation, and he offered to help her log into her T-Mobile account to order a new phone. Thereafter, while the Defendant waited for more than two weeks for a new SIM card to be delivered, she and Yarwood became close companions and inseparable, spending every day together exploring the city from early in the morning to late at night. The Defendant testified that Yarwood explained that he worked as a senior officer for the U.N. and that he had just finished an assignment in India. The Defendant believed that he was on leave, exploring the area before deciding whether to accept a new assignment in Bangkok.

After spending two weeks together, Yarwood offered to hire the Defendant as his assistant. The Defendant testified that Yarwood explained that his former assistant had recently retired and that he wanted to hire another assistant who was older, like the Defendant, because a young assistant closer to his own age would be more likely to flirt or be a back-stabbing climber. While the Defendant stated that she initially did not feel qualified to work as an assistant to a U.N. officer, she eventually agreed to accept the position. The Defendant also testified that she and Yarwood never had a romantic relationship, but it appears from her demeanor at trial and testimony that she was emotionally smitten with the senior U.N. officer. The Plaintiff testified that the Defendant loved him.

Soon thereafter, the Defendant traveled to Siem Reap, Cambodia with Yarwood and fell in love with the area. After she expressed her love of Cambodia, Yarwood soon received an offer from the U.N. to take control of their office in the capital of Cambodia, Phnom Penh. Yarwood and the Defendant then started searching for and found a house in which they could both live in separate quarters and set up what the Defendant described as a "U.N. satellite office."[20] While in Bangkok, the Defendant testified that she and Yarwood paid their own expenses, but once in Cambodia the Defendant began paying for their combined living and office expenses. She understood that she would be reimbursed by the U.N. for covering these expenses. It was at this point that Yarwood appears to have gained access to the Defendant's Redstone account in which the Defendant had approximately $39,000.00 when she first traveled to India. Yarwood apparently began making transfers out of the account using Western Union.

The Defendant testified that by mid-July of 2023 she believed that Yarwood had negotiated a salary of $64,000.00 for her as his assistant, more than double the amount that she had requested when Yarwood asked her what she hoped to earn. Yarwood explained, however, that her paycheck would need to be deposited into a U.N. checking account. The Defendant testified that it had been difficult to access her Redstone account while traveling overseas because Redstone had blocked transactions that she made on several occasions. Yarwood explained that he had a friend named Julie, a U.N. banker, who could help the Defendant not only establish a U.N. account, but also transfer all of the funds in her Redstone account into the U.N. account. Yarwood also warned the

---

20 *See* Defendant's Exhibit 1, photograph.

Defendant not to log into the Redstone account to avoid complications that would arise from logging into the account from multiple locations.

Yarwood and the Defendant then began furnishing and setting up the "U.N. satellite office," purchasing office future, computers, and even a U.N. flag which the authorities later directed Yarwood to remove because he did not have a permit to display the flag outside the "satellite office."

In addition to setting up the office, the Defendant testified that Yarwood had her place telephone calls to look for medical supplies for the Ukrainian war. Otherwise, the Defendant admitted that she knew that she was not actually doing much work as Yarwood's assistant given the salary that she believed she was being paid. She eventually, however, decided not to worry because she was doing whatever he directed her to do and figured that if anyone got into trouble it would be her boss, Yarwood.

In October of 2023, the Defendant testified that Yarwood suggested that she needed to increase her Redstone Visa credit limit and apply for an American Express credit card because it would enable the Defendant to obtain future loans, if needed. The Defendant testified that she did not really want to increase her credit limit, but she thought Yarwood was smart, so she agreed. By this point, the Defendant testified that she never carried cash or had access to any funds and had given Yarwood her passport for safekeeping. When a problem later arose with her American Express card, the Defendant testified that Yarwood told her that it had something to do with a previous transfer and offered to start paying for everything because he was receiving a housing and living stipend from the U.N.

While the Defendant was overseas living an exciting new life as Yarwood's assistant, she and the Plaintiff remained close friends, communicating often through WhatsApp, a private messaging app. It is undisputed that the Defendant told the Plaintiff that she was working for the U.N. and that she sent several photographs of herself standing outside various U.N. buildings as proof of her employment.[21] As it turns out, the Defendant never actually entered any of the U.N. buildings in the photographs.

In October of 2023, the Defendant asked the Plaintiff to loan her $6,000.00 so she could obtain her Cambodian citizenship. The Defendant testified that Yarwood told her that she qualified for citizenship, and that a U.N. attorney named Tim could help her with the documentation, but Tim was only going to be in the area for a short period of time. The Defendant further testified that Yarwood explained that the money required to establish her citizenship had to come from an outside source of funds, it could not come from her U.N. account because it would create a conflict of interest. Accordingly, the Defendant reached out to the Plaintiff who agreed to loan the money to the Defendant by transferring $6,000.00 into the Defendant's Redstone account. Both parties agree that the transaction was a loan that was to be repaid immediately. It appears that the Defendant believed that she had the funds in her U.N. account to immediately repay the loan so on November 5, 2023, the Defendant asked the Plaintiff for her bank transfer information to repay the loan.[22] When the funds were not transferred as expected, the Plaintiff testified that the Defendant told her she would just give her the money when she arrived in Cambodia.

---

[21] Plaintiff's Exhibit 2.

[22] *See* Plaintiff's Exhibit 1, lines 157 -160.

Soon thereafter, the Defendant told the Plaintiff that she had highly confidential information about a possible nuclear attack on Huntsville, Alabama, warning her that the "missiles were in the silo" and there was only one way they come out. The Defendant even sent the Plaintiff a picture of herself wearing a gas mask.[23]

The Defendant testified that she believed that Yarwood had classified U.N. information involving a dispute between the United States and Russia. She also saw a document with a U.N. seal, showing that Huntsville, Alabama and Germany, where her sister lived, were both the targets of an upcoming nuclear attack. With Yarwood's permission and encouragement, the Defendant admits that she contacted the Plaintiff and encouraged her to come to Cambodia with her daughter. The Defendant testified that Yarwood also encouraged her to warn her sister, who like the Plaintiff transferred funds which Yarwood gained control over under similar circumstances.

The Plaintiff testified that she was sick and did not want to travel for a variety of reasons, including work and certain church obligations. The Plaintiff is a real estate broker with over forty years of experience. She owns a business called Sunbelt Business Brokers and a property management company which she was concerned about leaving for an extended period of time. However, the Plaintiff's daughter was going through a messy divorce, and the Plaintiff was very concerned that she might commit suicide. The Plaintiff testified that the Defendant told her that the Cambodian real estate market was an untapped market and encouraged her to bring her daughter to Cambodia to open a real estate office there. Concerned about her daughter, the Plaintiff eventually agreed to travel to Cambodia, with the understanding and assurance from the Defendant

[23] Plaintiff's Exhibit 4.

and Yarwood that she could return to Huntsville if the nuclear attack did not occur. While she wanted to help her daughter and was apparently concerned about the possible nuclear attack, the Plaintiff had business matters that she could not just abandon.

According to the Plaintiff, the Defendant and Yarwood assured her that they would arrange for her return to Huntsville when it was safe so she could take care of her business and clients. The Plaintiff testified that Yarwood was always on speaker phone and in the room with the Defendant when they talked on telephone making arrangements for the Plaintiff to travel to Cambodia. The Plaintiff talked to Yarwood about what she could pack to bring on the airplane and discussed where the Plaintiff would stay, but her main point of contact was her friend, the Defendant.

On November 18, 2023, the Defendant sent the Plaintiff a picture of the type of airplane that the "U.N. was working on getting" for the Plaintiff, her daughter, and the Plaintiff's four dogs.[24] On November 22, 2023, the Plaintiff sent the Defendant a message asking her to confirm with Yarwood that if nothing catastrophic happened, that Yarwood would order a plane to bring the Plaintiff home after three weeks. The Defendant replied "Absolutely, we will get you back whenever you are ready to go back. No worries, we've got you. :-)".[25] With her fears alleviated, the Plaintiff agreed to travel to Cambodia and to transfer funds into the Plaintiff's Redstone account with the initial understanding that the Defendant would immediately open an account for the Plaintiff in Cambodia and transfer the funds into the Plaintiff's account. The Plaintiff testified that she transferred the funds because she was concerned about the potential nuclear attack and because she wanted to help her daughter open a real estate business and start a new life.

---

24 *See* Plaintiff's Exhibit 1, lines 337-340.

25 *See* Plaintiff's Exhibit 1, line 597.

On November 27, 2023, the Plaintiff transferred $90,000.00 into the Defendant's Redstone account and the Defendant responded by confirming that she was setting up a separate savings account for the Plaintiff to hold the Plaintiff's funds until she arrived in Cambodia.[26]

The following day, on November 28, 2023, the Plaintiff went to Redstone and spoke to a bank manager and discovered that the Defendant's account was "red flagged." She became alarmed and asked the Defendant to freeze her Redstone account but was told by the Defendant that her money was safe. The Defendant testified that when the Plaintiff contacted her about the account, Yarwood logged into the Defendant's account and told her that $8,000 or $9,000 had been transferred out of the account, but the Defendant thought that Julie, the U.N. banker, must have started the transfer to the separate account set up for the Plaintiff. She agreed with the Plaintiff to have Julie transfer the money back into the Redstone account, but then Yarwood took the telephone out of her hands and talked to the Plaintiff for approximately half an hour. After further discussions that day, it appears that the Plaintiff agreed to leave the money in the Defendant's Redstone account, stating to the Defendant via WhatsApp "we KNOW who it is that tried to cause a 'breach' . . . Sorry for the confusion."[27] After the initial confusion with the account, the Defendant testified that she told Yarwood that she did not want to keep the Plaintiff's money in her account anymore.

Thereafter, it appears that the Plaintiff and the Defendant continued to discuss travel plans and the Plaintiff's arrival in Cambodia while also discussing transferring the Plaintiff's funds back

---

26 *See* Plaintiff's Exhibit 1, lines 663-671.

27 *See* Plaintiff's Exhibit 1, lines 690-693.

to the Plaintiff. On December 4, 2023, the Defendant requested additional bank routing information from the Defendant, stating "We are sending $96,000 to you."[28]

On December 5, 2023, after the funds had not been received, the Plaintiff testified that she contacted the Defendant and asked her to place a hold on the Redstone account and to keep the hold a secret from both Julie and Yarwood. The same day the Plaintiff sent the Defendant an urgent message stating that she had spoken with Redstone and had been told that the transfer of funds from account to account was an instant transaction.[29]

The Defendant testified that she felt that it would be disrespectful to put a hold on the account without telling Yarwood, but eventually agreed to go to the American Embassy in Phnom Penh to request assistance after the Plaintiff told her additional money was missing. Unfortunately, the Defendant testified that someone at the Embassy merely told her to talk to Yarwood about the missing money. Yarwood then met the Defendant in Phnom Penh and gave her back her passport but also convinced her to return to Siem Reap with him.

At some point on December 5, 2023, the Plaintiff was able to place a freeze on the Defendant's Redstone account, authorized by friend of the Defendant named Bethany whom the Defendant had given financial power of attorney before leaving for India. There was $47,000.00 remaining when the Plaintiff froze the account.

On December 6, 2023, after the Defendant learned that the Plaintiff had frozen the Redstone account without her permission, the Defendant unfroze the account by video conference call and sent the Plaintiff a text stating that she was in complete control of her life in Cambodia

---

28 *See* Plaintiff's Exhibit 1, lines 792-796.
29 *See* Plaintiff's Exhibit 1, lines 827- 835.

and that the American Embassy did not perceive any danger for her. She then reaffirmed once again that she would have the $96,000 transferred to a Redstone account owned by a mutual friend named Tijuana Russsel.[30] This was apparently necessary or believed by the parties to be necessary because the Plaintiff did not have an active account at Redstone.

The Defendant's faith in Yarwood and belief that she had full control over her own life quickly ended the following day after she spoke with her pastor from home at the Plaintiff's request. On December 7, 2023, Yarwood assured the Defendant that Julie had wired the funds to the Plaintiff, but for the first time she noted that the document he showed her looked fake. At some point that day, the Defendant's pastor called her and asked Yarwood to leave the room so he could speak with the Defendant privately. It was at this point that the Defendant's pastor convinced her that she had fallen victim to a common scam and told her to leave Cambodia and return home. The Defendant testified that she was afraid that Yarwood would not let her leave, so she pretended everything was okay and told him she was going to bed.

On December 8, 2023, the Defendant called another friend and asked her to purchase a ticket for her to fly to Bangkok so she could seek help from the American Embassy. She left Siem Reap, at first on foot early in the morning, and then caught a ride to the airport where she flew to Bangkok. Once in Bangkok, her pastor was able to help arrange a flight home for her.

The Defendant did not have access to her cellphone while traveling home because the SIM card she had obtained in Cambodia no longer worked. It appears that Yarwood still had access to her Redstone account during this time and continued to syphon the Plaintiff's money from the

---

30 *See* Plaintiff's Exhibit 1, lines 853-859.

account but could only do so in limited daily increments. Once the Defendant arrived in Huntsville, her pastor took her to Redstone where she closed her account.

At some point, the Defendant discovered that there was still $33,797.02 in a savings account at Redstone. Although the Defendant had $39,000 in savings before she left for India, she testified that she knew that any money in the account belonged to the Plaintiff. The Defendant eventually returned all of the remaining funds in the account to the Plaintiff by writing a check out of the account and giving it to their pastor to return to the Plaintiff, despite having no money left herself.

## CONCLUSIONS OF LAW AND FINDINGS

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. But this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'"[31] The statutory exceptions to discharge under § 523(a) of the Bankruptcy Code reflect Congress's decision "to exclude from the general policy of discharge certain categories of debts,' on the theory that some categories of debt [such as fraud] 'outweigh[] the debtors' interest in a complete fresh start."[32] As a court of equity, this Court is mindful of the fundamental objectives of the Bankruptcy Code and the delicate balance the statutory exceptions to discharge are intended to achieve. The Court has carefully considered the evidence adduced at trial and the credibility of the witnesses who testified at trial in making this decision while keeping this intended balance in mind.

---

[31] *Monson v. Galaz (In re Monson)*, 661 Fed. Appx. 675, 682 (11th Cir. 2016).

[32] *Harris v. Jayo (In re Harris),* 3 F.4th 1339, 1345 (11th Cir.. 2021)(quoting *In re Bilzerian,* 153 F.3d 1278, 1281 (11th Cir. 1998)).

In her Amended Complaint, the Plaintiff argues that the Defendant made numerous false representations of material fact regarding her employment with the U.N., having access to classified national security information related to an impending nuclear attack, the necessity of transferring the Plaintiff's funds for safekeeping with assurances of security and control of the Plaintiff's funds, and that the Defendant knew these representations were false when made and were made with intent to deceive the Plaintiff. The Plaintiff further argues that the Defendant engaged in a course of conduct designed to create a false and misleading impression which included fabricated narratives and ongoing deceptive communication and that the Defendant engaged in a scheme to defraud the Plaintiff which resulted in the Plaintiff's loss of $62,203.00. The Plaintiff seeks an order excepting the debt from discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code which states as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.][33]

Courts generally interpret "§ 523(a)(2)(A) to require the traditional elements of common law fraud."[34] Thus, to prevail on the question of dischargeability under § 523(a)(2)(A), a creditor must show that "(1) the debtor made a false representation with the intention of deceiving the creditor, (2) the creditor relied on the false representation, (3) the reliance was justified, and (4)

---

33 11 U.S.C. § 523(a)(2)(A).

34 *In re Harris,* 3 F.4th at 1345 (quoting *In re Hudson,* 107 F.3d 355, 356 (5th Cir. 1997)).

the creditor sustained a loss as a result of the false representation."[35] Creditors must prove each element under § 523(a)(2)(A) by a preponderance of the evidence.[36] "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[37]

In the case of *Harris v. Jayo (In re Harris),* 3 F.4th 1339 (11th Cir. 2021), the Eleventh Circuit explained that "[t]he actual fraud prong 'encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation. . . . [A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'"[38] A false representation is not required for a finding of actual fraud. The Eleventh Circuit further explained "that the false pretense and false representation prongs of § 523(a)(2)(A) each requires an 'intentional wrong' - the false pretense or false representation 'must have been knowingly and fraudulently made.'"[39] The Eleventh Circuit stated that "[s]uch construction ... is consonant with equity, and consistent with the object and intention of Congress in enacting a general law by which the honest citizen may be relieved from the burden of hopeless insolvency."[40]

For purposes of § 523(a)(2)(A), the Eleventh Circuit has explained that the term 'false pretenses' is expansive, stating:

---

[35] *Taylor v. Wood (In re Wood*), 245 Fed. Appx. 916, 917 (11th Cir. 2007)(citing *In re Bilzerian,* 153 F.3d 1278, 1281 (11th Cir. 1998)).
[36] *Grogan v. Garner,* 498 U.S. 279 (1991).
[37] *In re Harris,* 3 F.4th at 1345 (11th Cir. 2021)(quoting *In re Bilzerian,* 153 F.3d 1278, 1281 (11th Cir. 1998)).
[38] *Id.* (quoting *Husky Int'l Elecs., Inc. v. Ritz,* 578 U.S. 356, 136 S. Ct. 1581 (2016).
[39] *Id.* (quoting 4 Collier on Bankruptcy, ¶ 523.08[1][d](16th ed. 2018)).
[40] *Id.* (quoting *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1877)).

> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consists of any acts, work, symbol, or token calculated and intended to deceive . . . It is a series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor . . . . Silence or concealment as to a material fact can constitute false pretenses.[41]

The Eleventh Circuit further explained that "false pretenses contemplates a misrepresentation that is intentional or made with reckless indifference to the truth."[42]

Negligence does not suffice under § 523(a)(2). In the *Harris* case, the Eleventh Circuit held that a general default judgment entered against a Chapter 7 debtor in a state court action could not be given collateral estoppel effect where the judgment creditor's negligent misrepresentation claim under state law did not require the debtor's knowledge that the misrepresentation was false.[43] Rather, in his negligent misrepresentation claim, the creditor alleged that the debtor "was negligent in making [certain] representations because he knew *or should have known* [they] were false."[44] While the creditor's claim satisfied the elements of negligent misrepresentation under state law, "the complaint did not allege an intentional misrepresentation, as required by the Bankruptcy Code."[45] The Eleventh Circuit held that a "negligent misrepresentation does not equate to false pretenses, a false representation[,] or actual fraud for purposes of nondischargeability under [§]

---

41 *In re Wood*, 245 Fed. Appx. 916, 918 (quoting *In re Gilmore*, 221 B.R. 864 (Bankr. N.D. Ala. 1998)).
42 Id.
43 *In re Harris*, 3 F.4th at 1350.
44 Id.
45 Id.

523(a)(2)(A)."[46] Rather, "[a] 'false pretense' is established or fostered willfully, knowingly, and by design; it is not the result of inadvertence."[47]

Given that § 523(a)(2)(A) generally "contemplates a debtor's specific intent to mislead, trick, or cheat" and that human nature makes it unlikely that a debtor will admit intent to deceive, the bankruptcy court "is permitted to infer such fraudulent intent from the facts and circumstances of the case."[48] To determine whether a debtor has the requisite fraudulent intent to deceive based on the totality of the circumstances, the Court must make an assessment of the debtor's credibility.[49] While the facts in this proceeding are largely undisputed, the parties diverge on the issue of intent which is what this Court must now decide after having assessed the Defendant's credibility and demeanor at trial.

Here, the Plaintiff argues that she does not rely on single misrepresentation nor on the Defendant's mere carelessness. Rather, she argues that the cumulative force of the Defendant's own false statements, her assurances that the Plaintiff's funds were safe, and her decisions after the Plaintiff froze the Redstone account, satisfy the intentional misconduct requirement. It is undisputed that the Defendant told the Plaintiff that she worked for the U.N. as Yarwood's assistant, that she warned the Plaintiff of a possible nuclear attack on Huntsville, and that she represented that a U.N. plane would transport the Plaintiff, along with her daughter and four dogs, to Cambodia. The Plaintiff argues that whatever Yarwood "may have falsely told [the Defendant]

---

46 *Id.* (quoting *Dare v. Jenkins (In re Jenkins),* 607 B.R. 270, 286 (Bankr. N.D. Tex. 2019)).

47 *Robb v. Gividen (In re Gividen)*, 667 B.R. 171, 181 (Bankr. N.D. Ga. 2025)(Baiser, J.).

48 *In re Gividen,* 667 B.R. at 181.

49 *Id.* at 182.

about the future, he could not make her believe that she had received pay she had not received, or that she physically possessed [U.N.] credentials [that] she did not possess."[50]

Unfortunately, it appears that the Defendant did in fact naively believe that she worked for the U.N. as Yarwood's assistant and all of the other stories fabricated by Yarwood. Indeed, it appears that the Defendant was deceived by Yarwood about opening an "U.N. account" which never existed and transferring all of the funds in her Redstone account into the account which Yarwood controlled. More regrettably, she then encouraged her friend and her sister to do the same.

Yarwood devised a scheme to gain control over the Plaintiff's funds, and others, by telling the Defendant that he had confidential information involving a planned nuclear attack on Huntsville, Alabama which she should share with her friends so they could join the Defendant and travel to safety in Cambodia. The Defendant shared this information not only with the Plaintiff but also her sister, but there is no evidence that the Defendant shared the information with intent to deceive either the Plaintiff nor her sister.

The Plaintiff further argues that the Defendant personally induced her to transfer money into the Defendant's Redstone account and personally assured the Plaintiff that she would create a separate savings account to hold the Plaintiff's funds until she arrived in Cambodia on the U.N. plane. Then, after the Plaintiff requested that the funds be returned, the Plaintiff alleges that the Defendant assured her that the funds were safe and were in the process of being transferred back to the Plaintiff.

---

50 Plaintiff's Post-Trial Brief, ECF No. 49, p. 2-3.

While the Defendant does not dispute that she offered to open an account for the Plaintiff's own use while she was in Cambodia, nor that she requested repeated wiring instructions to return the funds, it appears that she actually relied upon Yarwood and his friend Julie, the "U.N. banker" to both open an account for the Plaintiff and to wire the funds back to the Plaintiff. On December 4, 2023, the Defendant sent the Plaintiff a message on WhatsApp, stating "*We* are sending $96,000 to you." She trusted Yarwood with the Plaintiff's funds and trusted him to wire them back to the Plaintiff just as she had trusted him with her own funds. During the trial, the Defendant testified that Yarwood offered to have his friend, Julie the "U.N. banker" open a U.N. account for the Defendant into which her U.N. paychecks would be deposited. She also allowed Yarwood and Julie to transfer the funds from her Redstone account into the U.N. account because she had encountered trouble using the Redstone account internationally. The Defendant further testified that she never carried cash and that Yarwood began "paying" for everything when she had trouble with her credit card, which Yarwood assured her was due to a prior transfer. The Defendant never logged into her Redstone account because Yarwood had told her that it would create a problem if the account was logged into from more than one location, presumably while the funds from the Redstone account were being transferred to her "U.N. account."[51]

While the Plaintiff argues that the Defendant made several statements asking her for additional wiring instructions and that these statements constitute false explanations for why the $96,000 had not been returned, there is simply no evidence that the Defendant knowingly and fraudulently made the statements with intent to deceive the Plaintiff. The Defendant trusted

51 *See* Plaintiff's Exhibit 1, lines 792-796.

Yarwood to transfer the Plaintiff's funds back to her just as she trusted him with all of her own money. So it appears that she requested additional wiring instructions every time the Plaintiff told her the funds had still not been transferred, naively relying on Yarwood's explanations for the delays.

Finally, the Plaintiff argues that once the Defendant knew that the Plaintiff's funds were being withdrawn from her Redstone account, the Defendant's continued assurances that the funds were safe and being transferred back to the Plaintiff "became incompatible with an innocent-conduit explanation."[52] After the Plaintiff expressly directed the Defendant to freeze the Redstone account and to not involve Yarwood or Julie, the Defendant admits that she refused to freeze the account without talking to Yarwood because she felt she was being disloyal to him. Then, when the Plaintiff was able to freeze the account, the Defendant further admits that she unfroze the account "because Yarwood told her that it was necessary to return the money" in a lump sum.[53] The following day, December 7, 2023, the Defendant continued to assure the Plaintiff that the funds were being transferred to her, stating "The banker has initiated the transfer."[54]

The Plaintiff insists that the Defendant's repeated statements of assurance that the funds were safe and were being returned constitute evidence of the Defendant's fraudulent state of mind. However, the Defendant testified that it was not until December 7, 2023, when she first suspected that something was wrong after Yarwood gave her a document purporting to show that the U.N. banker, Julie, had wired the funds to the Plaintiff because the document looked fake. Later that

---

52 *See* Plaintiff's Post-Trial Brief, ECF No. 49, p. 3.
53 *Id.*
54 *Id.* at p. 4.

day, the Defendant's pastor called her and insisted on talking to her without Yarwood in the room. It was at this point, after talking to her pastor, that she finally realized that she had fallen victim to a scam and decided to return home at her pastor's insistence without telling Yarwood her plan to suddenly leave.

While the largely undisputed facts in this case are astounding and sad, the Court carefully observed the demeanor of the Defendant during her testimony at the trial and found her testimony to be credible. The Court finds that the Defendant in fact believed that she was working for the U.N. as Yarwood's assistant, that Huntsville, Alabama was the target of a potential nuclear attack, and that Yarwood could arrange transportation for the Plaintiff on a U.N. plane that just happened to be leaving Alabama for Cambodia. The Plaintiff argues that the Court need not decide the precise moment at which the Defendant first understood the full scope of Yarwood's fraud, but instead whether the Defendant acted with intent to deceive which the Court simply does not find.

Intent to deceive can be inferred and determined based upon a number of facts and circumstances in a case. In this case, the Plaintiff asks the Court to find that the Defendant intended to deceive and to defraud the Plaintiff based upon many statements made by the Defendant at various times regarding bank accounts, proposed transfer of funds and other issues regarding which the Defendant testified that she told the Plaintiff based upon what Yarwood told her. However, the Court finds that the many statements made by the Defendant to the Plaintiff which the Plaintiff argues circumstantially evidence the Defendant's intent are outweighed on the scale of justice by certain undisputed actions taken by or that happened to the Defendant which clearly show that she did not intend to deceive or to defraud the Plaintiff.

The Defendant made statements to her sister which we now know were false, and her own sister lost money and became a victim of the Yarwood scam. In addition, the Defendant herself was a victim of Yarwood's fraud. When the Defendant met Yarwood she had approximately $39,000.00 in her Redstone account and unknowingly lost everything to Yarwood in a matter of months. However, the most telling action taken by the Defendant when she returned home from Cambodia penniless is that when she discovered that there was $33,797.02 in a Redstone account with her name on it, she insisted that the money was not hers and gave the money to the Plaintiff. A person intent on deceiving another to her benefit would not have taken such action. The Defendant testified that she knew that the money was not hers and did not belong to her even though she could have argued that she was entitled to these funds because of the $39,000.00 that she lost in the scam by Yarwood. If the Defendant had ever intended to deceive the Plaintiff, and personally benefit from deceiving the Plaintiff, she would not have given the newly discovered funds to the Plaintiff once she returned from Cambodia.

Based upon the totality of the circumstances and the testimony and evidence presented at trial, the Court concludes that the Plaintiff failed to establish by a preponderance of the evidence that the Defendant engaged in any intentional wrongdoing in this case for purpose of § 523(a)(2)(A), nor engaged in false pretenses or false representations with reckless indifference to the truth. The Court does not find that the Defendant intentionally engaged in a scheme to defraud the Plaintiff. While the Defendant was clearly gullible and with hindsight should have known that Yarwood's tales were fabricated, the Court does not find that the Defendant committed actual fraud nor knowingly made misrepresentations with intent to deceive the Plaintiff, nor with reckless indifference to the truth. The Defendant was herself the victim of a fraudulent scheme

perpetrated by Yarwood, just as Defendant's sister and the Plaintiff were victims of the international con man.

**CONCLUSION**

After carefully weighing all of the evidence and testimony adduced at trial, the Court finds that the Plaintiff failed to establish by a preponderance of the evidence that the Defendant used false pretenses or made a false representation with deceptive intent, nor committed actual fraud done with wrongful intent for purposes of § 523(a)(2)(A). Accordingly, the debt owed by the Defendant to the Plaintiff in the amount of $62,203.00 is discharged.

A separate judgment will be entered consistent with this Memorandum Opinion.

IT IS SO ORDERED.

Dated this the 24th day of September, 2026.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge